## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| PHILIPS MEDICAL SYSTEMS PUERTO RICO, INC., <br><br>     Plaintiff, <br><br>        v. <br><br> GIS PARTNERS CORP.; HERNAN TORO; DAVID SUMPTER and RADAMES BRACERO, <br><br>     Defendants. | CIVIL No. 15-02702 (GAG) <br><br> RE: PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF PURSUANT TO THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. §1030, PUERTO RICO'S INDUSTRIAL AND TRADE SECRET PROTECTION ACT, 10 P.R. LAWS ANN. §§4131-4141; BREACH OF CONTRACT; UNFAIR COMPETITION AND DEMAND FOR JURY TRIAL. |

## OMNIBUS MOTION IN OPPOSITION TO DEFENDANTS' DISMISSAL REQUEST

**TO THE HONORABLE COURT:**

COMES NOW plaintiff, Philips Medical Systems Puerto Rico, Inc. ("Philips PR" or "plaintiff"),[1] through the undersigned counsel and, in response to defendants' dismissal requests at **Docket Entries No. 53** and **No. 54**, very respectfully submits the instant omnibus motion in opposition to defendants' request for dismissal, on the following grounds:

## I.  SUMMARY OF ARGUMENT[2]

Philips PR respectfully submits that this Honorable Court cannot possibly conclude, on the face of the allegations detailing defendants' illegal scheme, that plaintiff's Computer Fraud and Abuse Act ("CFAA")[3] allegations constitute "naked assertions" devoid of "further factual enhancement".[4] Far from insufficient, plaintiff's averments surpass the *Twombly/Iqbal* plausibility threshold for sustaining a colorable

---

[1] As stated in its *First Amended Verified Complaint* (hereinafter "Amended Complaint"), Philips PR is a subsidiary of
[2] As further argued below, inasmuch as the merits of plaintiff's CFAA cause of action is intertwined with the issue of jurisdiction, this Honorable Court should presume that jurisdiction exists and proceed to determine whether its *First Amended Verified Complaint* passes muster under Fed. R. Civ. P. 12(b)(6). See Estate of Soler v. Rodríguez, 63 F.3d 45, n.1 (1st Cir. 1995).
[3] See 18 U.S.C. §1030.
[4] See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

claim against defendants under Sections 1030(a)(2)(C), 1030(a)(4), 1030(a)(5)(C) and 1030(a)(6)(A) of the CFAA.

Undeterred, defendants' still argue dismissal is appropriate by crowing: (1) that plaintiff's claim is ultimately a misappropriation of trade secrets claim;[5] (2) that the MRIs are not "protected computers";[6] (3) that the MRIs do not belong to Philips PR;[7] (4) that the CFAA is not intended to protect plaintiff's CSIP Digital Rights Management Application and Proprietary Service Applications;[8] (5) that defendant Bracero's access was at all times "authorized";[9] (6) that defendants' actions had to be conducted "through" interstate commerce for them to be liable;[10] (7) that the "damage" and/or "loss" requirements under the CFAA are not met;[11] (8) that the "traffic in passwords" element is, in similar turn, not met;[12] and (8) that plaintiff is engaging in trickery by redefining computer and Internet terminology in order to properly plead a colorable claim.[13]

Nonetheless, as will be shown, defendants' confounding and rhetorical arguments are unavailing. Accordingly, inasmuch as defendants have failed to show that Philips PR's allegations are insufficient to state a CFAA claim, their requests for dismissal should be denied outright.

---

[5] **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pgs. 2-3, 28.
[6] Id. at 16, 19, 21 and 32.
[7] Id. at pgs. 3, 25, 31-32, 34 and n.11.
[8] Id. at pgs. 2, 15 and 31.
[9] Id. at. pgs. 3 , 22-26.
[10] See **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pgs. 15-16, 18-21, 31-32 and n.11; see also **Docket Entry No. 53**, *Defendants' GIS Partners Corp.; Hernan Toro and David Sumpter's Motion to Dismiss First Amended Verified Complaint and in Opposition to Motion for Preliminary Injunction* (hereinafter "GIS Partners' Dismissal Request"), at ¶¶84-85.
[11] **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pgs. 26-28; see also **Docket Entry No. 53**, GIS Partners' Dismissal Request, at ¶¶68, 70, 72, 78 and 81.
[12] See **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pgs. 28-34.
[13] **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pg. 34.

## II.    ANALYSIS

### A.  Inasmuch as the CFAA provides both the basis of federal court subject matter jurisdiction and plaintiff's cause of action, the Court should treat Bracero's dismissal as one made pursuant to Fed. R. Civ. P. 12(b)(6).[14]

This Honorable Court is well aware of the standard for dismissal under Fed. R. Civ. P. 12(b)(6). As such, it bears no repeating. Suffice it to say that, for the Court to rule upon defendants' motions to dismiss for plaintiff's alleged failure to state a claim, it need only employ the main working principles that underlie its decision under said rule. To wit: (a) that the complaint be construed liberally; (b) that all well-pleaded facts be taken as true; and (c) that all reasonable doubts and inferences be drawn in favor of plaintiff. See Iqbal, *supra* at pg. 678; see also Baicker-McKee Janssen Corr, Federal Civil Rules Handbook, 459 (Thomson Reuters Westlaw 2014).

On the other hand, it merits discussing briefly the procedural standard for dismissal under Fed. R. Civ. P. 12(b)(1) inasmuch as defendant Bracero's argument fails to recognize that Philips PR's ability to demonstrate the elements of a cause of action under the CFAA is central to the merits of its civil action as well.[15] Hence, the Court cannot dismiss plaintiff's claim for "lack of subject matter jurisdiction" unless it finds that Philips PR's claim is "immaterial", "clearly frivolous" or "wholly insubstantial". See Estate of Soler, *supra* at n.1 (citing Bell v. Hood,[16] 327 U.S. 678, 683-683 (1946); see also Wright & Miller, Federal Practice and Procedure: Civil 3d, §1450, n.18 and 64

---

[14] By way of contrast, remaining co-defendants' request for dismissal is solely premised upon Fed. R. Civ. P. 12(b)(6); reason for which their motion to dismiss should be deemed as a plea for summary judgment and denied outright for failing to comply with the procedural and substantive requirements of Fed. R. Civ. P. 56. See Trans-Spec Truck Serv. Inc. v. Caterpillar, Inc., 524 F.3d 315, 321 (1st Cir. 2008)(holding that matters outside the pleadings considered by the court will cause a motion to dismiss under Rule 12(b)(6) to be treated as one for summary judgment.

[15] See *supra* at n.14. A facial review of co-defendant GIS Partners Corp.'s, Hernan Toro's (hereinafter "Toro Aponte") and David Sumpter's (hereinafter "Sumpter López") requests for dismissal serves to show that it is not predicated under Fed. R. Civ. 12(b)(1), but on plaintiff's alleged failure to state a claim upon which relief can be granted.

[16] Relied upon by defendant Bracero in both its requests for dismissal. See **Docket Entry No. 28**, *Bracero's Motion and Memorandum Showing Cause Why Injunctive Relief Should be Denied and Seeking Dismissal Under Fed. R. Civ. P. 12(b)(1) and 12(b)(6)*(hereinafter "Bracero's First Dismissal Request") at pg. 10; see also **Docket Entry No. 54**, at pg. 13.

(Thomson West 2004).

For purposes of Fed. R. Civ. P. 12(b)(1), when faced with a motion to dismiss for "lack of subject matter jurisdiction" a district court, "absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first". <u>See</u> <u>Fernandez Molinary v. Industrias La Famosa</u>, 203 F.Supp.2d 111, 114 (D.P.R. 2002). Therefore, "as a general matter, trial courts should give 12(b)(1) precedence". <u>See</u> <u>Dynamic Image Technologies Inc. v. U.S.</u>, 221 F.3d 34, 37 (1st Cir. 2000). The reasoning for the above formulation is that an objection to "subject matter jurisdiction"[17] goes to the power of the court to hear and decide the case and, as is known, the parties may not create or destroy jurisdiction either by agreement or consent. <u>Federal Practice and Procedure: Civil 3d</u>, *supra* at §1450, pg.128; <u>Vélez v. Awning Windows Inc.</u>, 375 F.3d 35, 43 (1st Cir. 2004).

Although, as many courts have noted, a motion under Rule 12(b)(1) should not be confused with a motion under Rule 12(b)(6), the basic difference between the two lies on the court's ability to consider materials outside of the pleadings, such as affidavits, without converting the motion to dismiss into one for summary judgment. <u>See</u> <u>Fernández Molinary</u>, *supra* at 115; <u>see also</u> <u>González v. U.S.</u>, 284 F.3d 281, 288 (1st Cir. 2002); <u>Federal Practice and Procedure: Civil 3d</u>, *supra* at §1450, n. 47. Another difference between the two is that the former deals with procedural defects, while the latter addresses the merits of the claim. <u>Fernández Molinary</u>, *ante* at n. 3.

Despite these differences, nonetheless, and regardless of the character of a Rule 12(b)(1) motion, when considering a motion to dismiss under Fed. R. Civ. R. 12(b)(1) – as with Rule 12(b)(6) motions – it is well settled that courts are still required to construe

---

[17] Congress has given federal courts subject matter jurisdiction under 18 U.S.C. §1331 to hear "only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on [sic] resolution of a substantial question of federal law". <u>See</u> <u>Franchise Tax Bd. v. Const. Laborers Vacation Trust</u>, 463 U.S. 1, 27 (1983).

the complaint liberally, treat all well-pleaded facts as true and indulge all reasonable inferences in favor of the non-moving party. Id. at 114, citing Aversa v. U.S., 99 F.3d 1200, 1210 (1st Cir. 1996); Federal Practice and Procedure: Civil 3d, *supra* at §1450, n. 48. Furthermore, there is leading authority that establishes that whenever the existence of a federal claim and federal jurisdiction turn upon whether the complaint states a federal question, the preferable practice is for the court to assume that jurisdiction exists and proceed to determine whether the claim passes muster under Rule 12(b)(6). Estate of Soler, *supra* at n.1; Federal Practice and Procedure: Civil 3d, *supra* at §1450, n. 40 and 64; Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1189 (2nd Cir. 1996); Morrison v. Amway Corp., 323 F.3d 920, 925 (11th Cir. 2003). Thus, to the extent that a federal statute provides the basis for both subject matter jurisdiction and a cause of action, dismissal should be premised upon Rule 12(b)(6) unless the court finds the complaint to be wholly insubstantial or clearly frivolous. see also Estate of Soler, *supra* at n.1; Arroyo Torres v. Ponce Fed. Bank, F.B.S., 918 F.2d 276, 280 (1st Cir. 1990); Bell *supra* at 682-683.

In the case at bar, defendant Bracero urges the Court to dismiss Philips PR's Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).[18] Specifically, Bracero contends that Philips PR's claim under 18 U.S.C. §1030 is "fatally defective" because defendant's alleged offensive conduct "does not involve 'protected computers'" nor "password trafficking";[19] Bracero's access was at all times "authorized";[20] and plaintiff does not meet the "damage" and/or "loss" requirements under the CFAA.[21] In that same vein, and provided that the Court lacks proper subject matter jurisdiction over

---

[18] See *supra* at n.14.
[19] **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pgs. 19-22 and 29-31, 34.
[20] Id. at. pgs. 3 , 22-26.
[21] Id. at. pgs. 26-28.

Philips PR's CFAA cause of action, Bracero argues that the Court too lacks supplemental subject matter jurisdiction over plaintiff's state law claims.[22]

Bracero is wrong. The fact of the matter is, however, that plaintiff's Amended Complaint clearly raises a federal question. Simply put, whether Philips PR is entitled to recovery will depend upon a factual determination of whether Bracero's access has been without authorization or in excess of authorization; whether defendant's actions constitute an offense of §1030(a)(6);[23] and whether plaintiff has suffered damage and/or loss as a result of the unauthorized access of a computer or "protected computer".[24] Undoubtedly, **the Court cannot address these questions until after it has assumed jurisdiction**. See Bell, *supra* at 682 ("[T]he court must assume jurisdiction to decide whether the allegations state a cause of action on which the court can grant relief"). To that end, the Court cannot and should not dismiss plaintiff's CFAA claim for lack of subject matter jurisdiction at this stage, as suggested by defendant Bracero.

At the same time, while Bracero's Second Dismissal Request makes reference to remaining co-defendants' declaration[25] from Medical X Ray Center P.S.C.'s owner, Dr. José Rivera ("Dr. Rivera"), upon review of the same it becomes clear that, whether or not it is considered by the Court makes no difference. Ultimately, Dr. Rivera's statement is so plain and inconclusive it cannot support a 12(b)(1) "factual" or "substantive" challenge on subject matter jurisdiction.[26] See Federal Civil Rules Handbook, *supra* at

---

[22] Id. at pgs. 34-35.

[23] If done knowingly and with intent to defraud, it is an offense to traffic in any password or similar information through which a computer may be accessed without authorization if the trafficking affects interstate or foreign commerce. See 18 U.S.C. §1030(a)(6)(A).

[24] With the exception of Section 1030(a)(5)(C) of the CFAA, all other sections claimed by Philips PR to have been infringed by defendants require a showing of damage **OR** loss, not both. See 18 U.S.C. §1030(a)(5)(C); compare with 18 U.S.C. §1030(a)(2)(C), (a)(4) and (a)(6).

[25] See **Docket Entry No. 53-1**.

[26] At best, Dr. Rivera's declaration could be read to support Bracero's attempt to counterattack plaintiff's CFAA claim by arguing that Philips PR is the party acting in violation of the referred statute. Although defendant's argument

435-436; <u>Federal Practice and Procedure: Civil 3d</u>, *supra* at §1450, n.13. Defendant, therefore, is fishing an empty stream when attempting to apply a wholly inapplicable standard. Besides, along with this conclusion is the "coincidence" that Bracero's request for dismissal is an "indirect attack" on the merits of plaintiff's CFAA claims. <u>See</u> **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pg.3;[27] <u>see also</u> <u>Federal Practice and Procedure: Civil 3d</u>, *supra* at §1350, n.18 (citing <u>Peckmann v. Thompson</u>, 966 F.2d 295, 297 (7th Cir. 1992); <u>see also</u> <u>Kerns v. U.S.</u>, 585 F.3d 187, 193 (4th Cir. 2009)("'[W]here the jurisdictional facts are intertwined with the facts central to the merits of the dispute'... a trial court should then afford the plaintiff the procedural safeguards that would apply were the plaintiff facing a direct attack on the merits"); <u>Morrison</u>, *supra* at 925. That is, the arguments relied upon by defendant Bracero rest on Philips PR's alleged failure to state or "properly plead" a colorable claim upon which relief can be granted.[28] Accordingly, the Court should treat Bracero's request for dismissal as one made pursuant to Rule 12(b)(6). <u>Id</u>.

**B. Philips PR's allegations contain a level of specificity sufficient to easily surpass the *Twombly/Iqbal*[29] plausibility threshold.**

**1. Preliminary considerations involving defendants' arguments involving "ownership", "interstate commerce" and "trade secrets".**

Now then, having aside the standard put forth by Fed. R. Civ. P. 12(b)(1), defendants' dismissal argument for Philips PR's alleged "failure to state a claim upon

---

concerning plaintiff's alleged breach of the CFAA is addressed further below, Philips PR trusts the Court will share its view that Dr. Rivera's statement in no matter whatsoever places in issue the accuracy of plaintiff's jurisdictional allegations. What is more, Dr. Rivera's account does not touch upon defendants' actions and whether they've been without authorization or in excess of authorization; whether Bracero has trafficked or not passwords in violation of 18 U.S.C. §1030(a)(6); whether the MRI fits the mold of a computer or "protected computer" as defined under the CFAA; and/or whether Philips PR has suffered damage or loss as a result of defendants' actions. All of this, without considering that each of said factual determinations <u>would still involve the merits of the dispute</u>. <u>See also</u> *infra* Section II.C.1.

[27] "The allegations of the Amended Complaint show that this case still lacks the factual elements to confer subject matter jurisdiction to this Court, and which are also necessary to state a claim upon which relief can be granted under the CFAA."

[28] <u>See</u> e.g. **Docket Entry No. 54**, at pgs. 2, 16, 18-21, 28, 30-32, 37, nn.11-12.

[29] <u>See</u> *supra* at n.4.

which relief can be granted" is merely an attempt at artful pleading in an effort to create an issue that is not really there. First, plaintiff addresses defendant Bracero's arguments concerning "ownership" and "interstate commerce" inasmuch as defendant clings to this broad and self-serving construction of the CFAA as the main basis for dismissal, while simultaneously calling for the Court to apply the strictest and narrowest conceivable interpretation of the law when ruling upon all remaining arguments; in-line with the persuasive and non-dispositive case law cited in support. As a general principle, Bracero cannot have his cake and eat it too. See Cherry Hill Vineyard, LLC v. Baldacci, 505 F.3d 28, n.9 (1st Cir. 2009); Dopp v. Pritzker, 38 F.3d 1239, n.6 (1st Cir. 1994).

From the onset, Bracero and remaining co-defendants have fervidly cautioned the Court from taking on an expansive view of each of the CFAA's threshold requirements, up to the point of accusing plaintiff of engaging in the stunt of "creatively" "redefining" computer and Internet terminology solely for the purpose of obtaining jurisdiction. [30] Nowhere, however, does the CFAA impose an "ownership" or "control" requirement for an individual to be harmed under the federal statute. See Theofel v. Farey-Jones, 359 F.3d 1066, 1078 (9th Cir. 2003). As Section 1030(g) provides, the civil remedy afforded by the CFAA extends to "any person who suffers damage or loss by reason of a violation of this section". See 18 U.S.C. §1030(g). In fact, the few courts that have addressed the question have rejected such notion of possessorship. See Theofel, supra at 1078 ("The district court erred by reading an ownership or control requirement into the Act"). Particularly if the individual harmed has rights over the data stored on the computing device. Id.

---

[30] See **Docket Entry No. 54**, at pgs. 34; see also **Docket Entry No. 28**, Bracero's First Dismissal Request, at pgs. 1-2.

The same conclusion can be drawn from defendants' argument that their actions had to be conducted "through" the Internet.[31] Pursuant to defendants, the CFAA is only intended to address conduct that takes place "through" or "involving" interstate commerce. And because the Internet is an "instrumentality and channel of interstate commerce", logic dictates that under the CFAA that would solely refer to conduct transmitted through a computer electronically. See U.S. v. Trotter, 478 F.3d 918, 921 (8th Cir. 2007);[32] see also Multiven, Inc. v. Cisco Systems, Inc., 725 F.Supp.2d 887, 891-892 (N.D. Cal. 2010). Nonetheless, no language in the CFAA supports defendants' thesis that an individual's liability for engaging in conduct violative of Sections 1030 (a)(2)(C), 1030(a)(4), 1030(a)(5)(C) and 1030(a)(6)(A) turns on whether the conduct itself was an "interstate" act of "commerce" or "communication".

The contextual difference that arises from defendants' clever employ of the term "involve" quickly vanishes when the terms "used in" or "affecting" – as conspicuously used by the CFAA – are interjected in the Court's analysis. As Sections 1030(a)(6)(A) and (e)(2)(B) make clear, nothing in said provisions reads in such way that would lead to defendants' conclusion.[33] Also, the word "or" means what is says. Accordingly, defendants' reading of the statute is not viable and any other holding would render portions of the CFAA meaningless and would lead to an absurd result.

If this construction were to hold, for example, the physical insertion/uploading of a program or virus on a computer through a USB Flash Drive, CD or other type of disk drive, intended to cause damage to the computer's files would inanely be excluded from

---

[31] See supra at n. 10.
[32] Holding that "[t]he Internet is an instrumentality and channel of interstate commerce".
[33] Section 1030(a)(6)(A) reads in pertinent part: "[W]hoever... knowingly and with intent to defraud traffics (as defined in section 1029) in any password or similar information through which a computer may be accessed without authorization if – such trafficking affects interstate or foreign commerce". In turn, Section (e)(2)(B) provides in relevant part that a "protected computer" means "a computer – (B) which is used in or affecting interstate or foreign commerce or communication".

the statute's grasp. <u>See</u> e.g. <u>International Airport Centers, L.L.C. v. Citrin</u>, 440 F.3d 418, 419-420 (7th Cir. 2006)(Hon. Judge Posner).[34]   As this Honorable Court is certainly aware – so far as the electronic modes of interacting with a computing device are concerned – the mechanics of physically uploading or inserting a program into a computer do not necessarily require an Internet transmission or communication. That is, the so-described action does not need to travel or take place through the channels of commerce. For this reason, permitting defendants' judgment to prevail would provide a cause of action only for plaintiffs that were injured through an electronic transmission or communication, as opposed to those who suffer – as Congress too intended – physical damage. <u>See</u> e.g. <u>EF Cultural Travel BV v. Explorica, Inc.</u>, 274 F.3d 577, 585 (1st Cir. 2001).

Beyond these basic errors in reading the CFAA, defendants' argument has another troubling flaw. And that is that defendants' individual reference to just one ***non-dispositive*** case in support of such theory paints a telling picture about their depiction as to how "settled" is the so-called "norm". <u>See</u> **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pg. 16. In short, it can be fairly said that defendants' argument in this respect is, at best, insubstantial. Hence, because defendants' proposed construction does not comport with the plain language of the CFAA, it would be improper for the Court to interpret the statute in such a manner.

Lastly, defendant Bracero's efforts to shift this Court's focus by labeling plaintiff's cause of action as a trade secrets misappropriation claim miss the mark completely. As the case law cited by defendants themselves show, what district courts have ruled against are the attempts by claimants to insert within the meaning of "loss" and

---

[34] Relied upon by Bracero at **Docket Entry No. 54**, pg. 27; <u>see also</u> **Docket Entry No. 28**, Bracero's First Dismissal Request, at pg. 16.

"damage" the act *per se* of stealing trade secrets. See e.g. Garelli Wong & Assocs., Inc. v. Nichols, 551 F.Supp.2d 704, 710 (N.D. Ill. 2008)(holding that misappropriation of trade secrets alone does not constitute damage under the CFAA). That is just not the case here. As alleged in the Amended Complaint, defendants' actions involve a two-step process: (1) the bypassing and damage/loss arising from defendants' circumvention of Philips' security measures as outlined by Sections 1030(a)(2)(C), 1030(a)(4), 1030(a)(5)(C) and 1030(a)(6)(A); and (2) defendants' misappropriation of plaintiff's trade secrets. This two-step process gives Philips PR the right to bring against defendants two distinct causes of actions; making Bracero's argument that the CFAA preempts a misappropriation of trade secrets claim incorrect. Although Bracero does not cite to them for obvious reasons, a number of cases have upheld claims filed against former employees under the CFAA, supplemented by causes of action for the misappropriation of trade secrets. See e.g. SuccessFactors, Inc. v. Softscape, Inc., 544 F.Supp.2d 975, 981-982 (N.D. Cal. 2008); NCMIC Fin. Corp. v. Artino, 638 F.Supp.2d 1042, 1076-1080 (S.D. Iowa 2009).

By the same token, the Court should not be fooled by Bracero's disingenuous attempt to turn the Court's eyes away from the language of Sections 1030(a)(2)(C) and 1030(a)(4) which, in order to be properly invoked, require the "intent to obtain" and subsequent obtainment of "information" or "anything of value" from a protected computer. See 18 U.S.C. §§1030(a)(2)(C) and 1030(a)(4). NCMIC Fin. Corp., *supra* at 1060-1063. Undeniably, Bracero should not be allowed to succeed in this "Catch-22" proposition. Plaintiff's allegations concerning defendants having obtained confidential information from within the MRIs belonging to Philips, is in direct compliance with the statute's requirements to successfully invoke a cause of action under Sections

1030(a)(2)(C) and 1030(a)(4), *supra*. As such, the Court should similarly reject defendants' contention in this regard.

> **2. Philips PR has more than adequately pled a *prima facie* case on the validity of its CFAA claim, inasmuch as substantial allegations have been raised as to make them fair ground for litigation against defendants.**

Having established the baselessness of defendants' main arguments, all of their remaining contentions fall by their own weight. By way of summary, we succinctly lay the necessary groundwork:

In order to successfully bring a civil action under the CFAA a plaintiff must show that it has suffered damage and/or loss[35] as a result of the unauthorized access – or access in excess of authorization – of a computer[36] or "protected computer" with the intent either to: (a) obtain information from a protected computer;[37] (b) further the fraud of unauthorized access and obtain anything of value;[38] (c) traffic in any information through which a computer may be accessed without authorization – if such trafficking affects interstate commerce;[39] or (d) solely as a result of the unauthorized access of a "protected computer".[40] As established below, plaintiff's allegations in the case at hand contain sufficient facts to surpass the *Twombly/Iqbal* plausibility threshold for sustaining a colorable claim under Sections 1030(a)(2)(C), 1030(a)(4), 1030(a)(5)(C) and 1030(a)(6)(A) of the CFAA.

> **a. Defendants' arguments concerning how "protected computers" is defined.**

Out of these aforementioned elements, defendants initially seek dismissal of the Amended Complaint on the basis that the MRIs are not "protected computers". The

---

[35] See *supra* at n.24.
[36] See 18 U.S.C. §1030(a)(2).
[37] Id.
[38] See 18 U.S.C. §1030(a)(4).
[39] See 18 U.S.C. §1030(a)(6).
[40] See 18 U.S.C. §1030(a)(5)(C).

Court, nonetheless, should find said argument to be meritless. Here, the defendants' do not sincerely dispute that the MRIs are connected to the Internet. According to them, it is just simply insufficient to plead that the computer has "Internet connectivity". See **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pgs. 19 and 21. Although they too contradict themselves by admitting as part of that same argument that the CFAA encompasses "internet-enabled devices" and that, "in order to be considered a 'protected computer' the corresponding device must be connected to the internet at the time of the offensive conduct". Id. at pgs. 18-19 Nevertheless, their "Internet connectivity" insufficiency plea is just not a valid theory.

Indeed, case law in which defendant Bracero has actually relied on holds that the "protected computer" element is established where the computers at issue are connected to the Internet. See Multiven, Inc., *supra* at 891-892;[41] but see also Continental Group, Inc. v. KW Property Management, LLC, 622 F.Supp.2d 1357, 1370 (S.D. Fla. 2009); Paradigm Alliance, Inc. v. Celeritas Technologies, LLC, 248 F.R.D. 598, 602 and n.5 (D. Kan. 2008); NCMIC Fin. Corp., *supra* at 1060; Merritt Hawkins & Assocs., LLC v. Gresham, 948 F.Supp.2d 671, 674 (S.D. Tex. 2013), relied on by Philips PR.[42] Other secondary sources have also reached the same conclusion. See Daniel J. Solove & Paul M. Privacy Law Fundamentals, 147 (IAPP 2013); Susan W. Brenner, Data Security and Privacy Law, 2 Data Sec. & Privacy Law §15:7 (2015). It therefore follows that defendants' proposition is merely another invitation to have the Court expound the CFAA in the strictest or broadest way possible; depending on which side of the playing field they're on.

Accordingly, and because Philips PR has properly plead – and sustained – that

---

[41] See **Docket Entry No. 54**, at pg. 30; see also **Docket Entry No. 28**, Bracero's First Dismissal Request, at pg. 22.
[42] See **Docket Entry No. 41**, *Plaintiff's Motion in Response to Defendants' Docket Entries No.28 and No. 32 and Supplementing Request for Preliminary Injunction.*

the MRIs are, and have at all times been, connected to the Internet, the Court should find that they are "protected" within the meaning of the CFAA. See 18 U.S.C. §1030(e)(2)(B); see also Trotter, *supra* at 921 ("[T]he Internet is an instrumentality and channel of interstate commerce"); **Docket Entry No. 38**, Amended Complaint, at ¶¶38-39, 60-62, 82, 95, 116 and 140. If such weren't the case, there is no other way plaintiff could've possibly become aware of defendants' unauthorized access. See **Docket Entry No. 38-8**.

### b. Defendants' contentions concerning "access".

Next, Bracero argues that his access to Philips' branded MRIs has been "authorized" at all times. In this respect, it appears defendant is intended to take advantage of the split in authority among Circuit Courts over whether an employee who misuses employer information pursuant to authorized physical computer access, "accesses a computer without authorization" or "exceeds authorized access" and, thus, can be held liable for civil damages under the Act. See Lisa J. Sotto, Privacy and Data Security Law Deskbook, §13.03[B] (Wolters Kluwer 2015).

Even so, Philips PR does not allege that Bracero merely "overstepped his authority". Rather, the crux of plaintiff's allegations is that Bracero and remaining co-defendants have hacked[43] and disrupted the MRI's host computers' secure systems **AFTER** Philips PR rescinded altogether their permission to access – through the MRI host computers – its CSIP Digital Rights Management Application. See **Docket Entry No. 38**, Amended Complaint at ¶¶96, 117 and 141. Furthermore, the Amended Complaint alleges that at the time of their unauthorized access defendants did so with

---

[43] "Hack. 1. To modify, especially in an improvised way: 'This version of the program has been hacked to run under UNIX instead of Windows... 3. to break into a computer system or otherwise do mischief: 'We've been hacked'". Barron's Dictionary of Computer and Internet Terms (Barron's Educational Series, Inc. 11th ed. 2013).

the required intent of Sections 1030(a)(2), 1030(a)(4) and 1030(a)(5)(C).[44] If true, these allegations adequately state a claim under a commonsense reading of these particular subsections.

In the context of the CFAA it has been held that the phrase "without authorization" should be interpreted as taking its ordinary, contemporary and common meaning, inasmuch as it remains undefined. See e.g. NCMIC Fin. Corp., *supra* at 1056-1058; In Re America Online, Inc., 168 F.Supp.2d 1359, 1369-1371 (S.D. Fla.); see also Perrin v. U.S., 444 U.S. 37, 42 (1979)("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning"); Register.com, Inc. v. Verio, Inc., 126 F.Supp.2d 238, 253 (S.D.N.Y. 2000). Here, it is undisputed that defendants are **former employees** of Philips PR. Moreover, defendants have raised NO arguments that **upon leaving** plaintiff's employ they had its permission or authorization to access Philips' CSIP Digital Rights Management Application. Other than Bracero's suggestion that because he had access at one point in time, somehow such access continues indefinitely,[45] defendants' one and only argument is that the MRIs' "true owners" have granted them access. But again, even though Medical X Ray and Aibonito Mennonite General Hospital may have given defendants physical access to the MRIs, that doesn't preclude Philips PR from maintaining proprietary and/or ownership rights over its CSIP Digital Rights Management Application, Proprietary Service Applications, and all software and trade secret data securely hosted within the MRIs' host computers and, in like manner, be harmed by defendants' actions. See **Docket Entry No. 38**, Amended Complaint, at ¶¶34, 76, 92, 115 and 137. Nothing in Section 1030(g) supports an ownership or control

---

[44] See **Docket Entry No. 38,** Amended Complaint, at ¶¶53, 55, 65, 89-154.
[45] **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pgs. 22-26.

requirement into the Act. See Theofel, *supra* at 1078. "Individuals other than the computer's owner may be proximately harmed by unauthorized access, particularly if they have rights to data stored on it". Id.

In addition, the Court should not overlook that Philips PR has already presented evidence that on multiple occasions, **following defendants' employment**, the MRIs have been accessed using Bracero's credentials.[46] To the point that neither of the defendants could reasonably contend they "maintained" or "believed they maintained" plaintiff's "authorization" to do so. All of this, aside from the fact that, as a former Philips PR employee, it is utterly convenient for Bracero to self-righteously claim to have "proper authorization" from Medical X Ray to access the MRI, while at the same time sanctimoniously divorcing himself from the restrictions of plaintiff's licensing agreement. See **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pg. 25.

Without question, Bracero cannot shield his actions by claiming "not being privy"[47] to plaintiff's licensing terms or challenging the validity of its Confidentiality Agreement.[48] Privy or not, valid or not, Bracero retains knowledge that his entries are "without authorization" from his mere awareness of being a non-employee of Philips PR. For these reasons, the Court should find that any access by defendants to the secure areas of the Philips Intera 1.5T and the Philips Panorama 1.0 following their

---

[46] At no point in time have defendants challenged that according to the log of the Philips Intera 1.5T, the MRI has been accessed using Bracero's credentials following the dates of their termination of employment. Neither has Bracero ever denied the reference of his former "UserID" pursuant to said log.

[47] This Honorable Court should not "buy into" Bracero's nonplused disposition. Already defendant has shown to possess great knowledge and dexterity of Philips' inner workings through several of his arguments. Clearly, defendant is testing the Court's knowledge to see how far he can stretch his efforts for dismissal without feeding it the complete picture of how the maintenance and repair services of Philips branded equipment is/or can be conducted. See **Docket Entry No. 28**, Bracero's First Dismissal Request, at n.1 ("it is unclear whether Philips advised the equipment purchasers that it embedded the MRI equipment with a Digital Rights Management Application, which is not functional unless the purchaser contracted with Philips for the machine's service and maintenance") and n.6 ("If Bracero was in fact trafficking Philips proprietary service applications over the Internet, Philips would have knowledge of it, as the same would automatically connect to Philips' servers"); see also **Docket Entry No. 37**, at ¶7 ("no actual computers are involved in this case"), compared with **Docket Entry No. 54**, at pg. 2 ("Now, Philips believes that, by alleging the obvious existence of computer elements within the MRI equipment... it has overcome the original deficiencies which warranted dismissal").

[48] See *infra*, Section II.3.

<u>employment</u> has been – as alleged by plaintiff – without authorization. <u>See</u> **Docket Entry No. 38**, Amended Complaint at ¶¶53, 55, 69, 79-81, 97, 99, 118-121, 123, 142-146.

### c. Plaintiff's alleged failure to plead "Loss"/"Damage".[49]

Defendants' third argument is that Philips PR has failed to properly meet the "damage" or "loss" requirements under the CFAA.[50] To be precise, they sustain that plaintiff's averments are no more than "threadbare recitals" of the elements of a cause of action under the CFAA and/or that it ultimately pursues compensation for the misappropriation of its trade secrets.[51] <u>See</u> **Docket Entry No. 54**, Bracero's Second Request for Dismissal, at pg. 26-28; <u>see also</u> **Docket Entry No. 53**, GIS Partners' Dismissal Request, at ¶¶57, 68, 70, 72, 78 and 81. Alternatively, defendant Bracero claims that the CFAA is not intended to address plaintiff's CSIP Digital Rights Management Application and/or Proprietary Applications. <u>See</u> **Docket Entry No. 54**, at pgs. 2 and 15. Unfortunately for defendants, plaintiff's claimed "damage" and/or "loss" as a result of their breach and circumvention of Philips' security measures, is not what can be denominated as "harm unrelated to a computer". <u>See</u> e.g. <u>SKF USA, Inc. v. Bjerkness</u>, 636 F.Supp.2d 696, 721 (N.D. Ill. 2009).

CFAA's civil action provision states, "[a]ny person who suffers damage **or** loss by reason of a violation of this section may maintain a civil action against the violator or obtain compensatory damages and injunctive relief or other equitable relief". <u>See</u> 18 U.S.C. §1030(g)(emphasis provided). On the other hand, "Loss", as defined by

---

[49] <u>See</u> *supra* at n.24. The Court should further note that defendants do not in any way challenge that through their actions, as alleged by plaintiff in its Amended Complaint, they have in fact obtained "information" and/or "anything of value" as required by Sections §1030(a)(2)(C) and (a)(4).

[50] <u>See</u> **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pg. 26-28; <u>see also</u> **Docket Entry No. 53**, GIS Partners' Dismissal Request, at ¶¶68, 70, 72, 78 and 81.

[51] Philips PR incorporates herein by reference its response to defendant's contention that plaintiff's cause of action is ultimately a misappropriation of trade secrets claim to the extent it is relevant.

§1030(e)(11), means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the **data**, **program**, **system**, or **information** to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service". See 18 U.S.C. §1030(e)(11)(emphasis ours); see also Therapeutic Research Faculty v. NBTY, Inc., 488 F.Supp.2d 991, 996 (E.D. Cal. 2007). "Damage", in turn, is defined as "any impairment to the integrity or availability of **data**, a **program**, a **system**, or **information**. See 18 U.S.C. §1030(e)(8)(emphasis ours).

As a preliminary matter, plaintiff notes that just because defendants characterize Philips PR's allegations as "mere incantations" and "legal conclusions", it does not make them so. Still, here too, plaintiff has adequately pled it has suffered "damage" as a result of defendants' intrusions. In its Amended Complaint Philips PR alleged that defendants' actions have caused it damage by disrupting the integrity and/or security of the MRI's host computers' security protocols; disrupting and/or impairing the integrity and/or security of its CSIP Digital Rights Management Application and/or Proprietary Service Applications; diminishing and/or abridging the usability of the MRI's host computers' security protocols to protect plaintiff's trade secret or confidential information; and/or by curtailing the usability of the confidential/trade secret data hosted on the MRI's host computers' access restricted areas, inasmuch as the impairment of the latter's security protocols no longer allows Philips PR to use said data or information for its own financial benefit. See **Docket Entry No. 38**, Amended Complaint at ¶¶87, 108, 132 and 153. Surely defendants cannot argue that plaintiff's "Integrated Security Tool" ("IST"),[52] along with its CSIP Digital Rights Management Application and trade secret

---

[52] See infra at n.53.

data contained within the MRIs do not constitute computer data as referred to by the CFAA. See 18 U.S.C. §1030(e)(8) and (11). Therefore, nothing suggests that the permanent breach/failure, which now exists in the IST/CSIP's security measures as a result of defendants' sophisticated intrusion, does not comport with the plain language of "damage" as defined by the CFAA.

Similarly, plaintiff's loss is not only shown by its hiring of ERM for purposes of conducting an investigation or assessment of defendants' security breach or intrusion into the MRI's host computers' access restricted areas – as alleged in the Amended Complaint – but by the hours spent by Philips' engineers and other internal resources for investigating and resolving this matter. EF Cultural Travel BV, *supra* at 584; SuccessFactors, Inc., *supra* at 981; NCMIC Fin. Corp., *supra* at 1064; see also **Docket Entry No. 38**, Amended Complaint, at ¶¶63-65. Accordingly, even assuming arguendo that plaintiff's allegations concerning its engagement of expert services somehow came short, defendants are still wrong in theorizing that Philips PR has failed to adequately plead "loss" pursuant to the CFAA. See **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pg. 28.

On that same account, costs associated with investigating system intrusions and taking subsequent remedial measures have also been construed as "losses" within the meaning of the CFAA. See Multiven, Inc., *supra* at 894-895 and 897. In addition, other cognizable costs include those involving the assessment of a hacked system; the time spent away from day-to-day responsibilities investigating an offense; the updating, reprograming, restoring or reconfiguring of a system's defenses to prevent future unauthorized access; the discovering of the identity of the offender; and/or the method by which the offender accessed the protected information. EF Cultural Travel BV, *supra*

at 584; <u>SuccessFactors, Inc.</u>, *supra* at 981; <u>NCMIC Fin. Corp.</u>, *supra* at 1064; <u>see also</u> 18 U.S.C. §1030(e)(11). Unquestionably, from a plain reading of the Amended Complaint, the Court can fairly conclude that as a result of the illegal scheme being employed by defendants to service Philips branded equipment, plaintiff too has suffered the type of aforementioned "loss" recognized by the CFAA. Hence, on this ground as well, defendants' argument is bankrupt.

As a final note, plaintiff deems relevant to point out that defendants desperately insist in putting forth before the Court an "empty shell theory" divorcing computers from their content – i.e. operating systems, data, programs, etc. – as if the CFAA were most concerned with the security of devices by themselves, rather than with the intended reasons for such security. But as the First Circuit very well noted in <u>EF Cultural Travel BV</u>, *supra* at 585, "Congress's use of the disjunctive, 'damage or loss', confirms that it anticipated recovery in cases involving other than purely physical damage". Beyond that, defendants cannot choose to ignore that the harms addressed by the CFAA – i.e. "damage"/"loss" – ultimately refer to computer data, systems and programs; which is precisely what plaintiff's "Integrated Security Tool"[53] and CSIP Digital Rights Management Application are. <u>See</u> 18 U.S.C. §1030(e)(8) and (11). As such, defendants' argument that the CFAA is not intended to address and/or protect data, programs, systems or other computer information, is no more than a hyper-complicated parsing of the statute unaccompanied by controlling legal support.

In sum, since plaintiff has shown through its allegations that it has suffered "damage" or "loss" as those terms are defined by the CFAA, defendants' argument should be denied. Despite they argue otherwise, under Fed. R. 12(b)(6), plaintiff's

---

[53] As described in its Amended Complaint, plaintiff's "Integrated Security Tool" or "IST" is Philips' <u>existing</u> proprietary platform/solution for its CSIP Digital Rights Management Application. IST provides backward compatibility to support legacy PMSSec protected applications still in use today. <u>See</u> **Docket Entry No. 38**, ¶¶11-15.

allegations of loss and/or damage bear on all material elements necessary to be entitled to recovery under Section 1030(g).

### d. Bracero's construction of "password trafficking".[54]

Regarding Philips PR's First Cause of Action, as Bracero kindly admits, "only a handful of federal cases even mention §1030(a)(6)". <u>See</u> **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pg. 29. Be that as it may, defendant misinterprets this as an invitation to formulate his own theory as to its meaning.

Section 1030(a)(6) of the CFAA provides in relevant part: "Whoever... knowingly and with intent to defraud traffics (as defined in section 1029) in any password or similar information through which a computer may be accessed without authorization, if – (A) such trafficking affects interstate or foreign commerce". <u>See</u> 18 U.S.C. §1030(a)(6)(A). In turn, Section 1029 defines "traffic" as "transfer or otherwise dispose of, to another, or obtain control of with intent to transfer or dispose of". 18 U.S.C. §1029; <u>See</u> **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pg. 29. Yet, Bracero conclusorily argues that the Amended Complaint "parrots" the elements of a cause of action under Section 1030 and that, in order for him to be held responsible, it must be shown that his "transfer" of plaintiff's "passwords" was made through the Internet. <u>See</u> **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pgs. 31-32. That, however, would mean that his "physically handing off" of his former Philips credentials to remaining co-defendants with the intent of wrongdoing – as alleged in the Amended Complaint[55] – of allowing them to interconnect and communicate without authorization with Philips' MRI host computers' access restricted areas, would not fall under the

---

[54] All arguments reproduced by Bracero regarding "protected computers", "loss/damage", "interstate commerce", "access", "ownership" and "computer programs", while addressing the merits of plaintiff's cause of action under Section 1030(a)(6), have already been addressed by Philips PR and are incorporated herein as reference to the extent they are deemed pertinent in disposing of defendant's contentions.
[55] <u>See</u> **Docket Entry No. 38**, ¶¶70-88.

purview of the CFAA.

Although courageous, defendant's theory is not within the realm of reason. First of all, Bracero's interpretation of the term "transfer" strays away from a "plain language" construction of the concept. See Perrin, *supra* at 42. Needless to say, it renders the remaining elements of "trafficking" – i.e. "otherwise dispose of" – as defined by Section 1029, *supra*, meaningless. Second, "affecting interstate commerce" is not the same as "through interstate commerce or "involving interstate commerce". This is not an esoteric concept. If Congress would've truly intended for "password trafficking" to turn on whether said action is conducted through the Internet, it can be safely argued that better language suited for that purpose could've been expected.

More fundamentally, however, and adding to plaintiff's previous responses to defendants' arguments regarding "access", the Court should be unwilling to accept that, because defendants have accessed the MRIs with Bracero's former Philips credentials, such actions have somehow been with "authorization". Upon termination of employment one would expect that a person of ordinary intelligence and with common sense understands the actions that he/she is totally prohibited from doing so altogether concerning his/her former employers' property. Defendants may not hide behind purported "authorization" granted to them by Philips PR while they were employees. Particularly given that defendants have at all times been presumably familiar with the terms of their Confidentiality Agreements pursuant to which they agreed not to disclose, in whole or in part, and/or by any means whatsoever, Philips' proprietary information and trade secrets.

Altogether, Bracero's former Philips credentials, along with the circumvented/hacked MR Response Generator Tool, have enabled defendants to access

the MRI host computers' access restricted areas without authorization. Given that the Amended Complaint markedly alleges that Bracero transferred – in whatever deceptive way he may have done so – his former credentials to co-defendants with the wrongful intent of wrongdoing (i.e. intent to defraud) of allowing the latter to interconnect and communicate without authorization with Philips' MRI host computers' access restricted areas, the Court should find that plaintiff has properly stated a trafficking claim under Section 1030(a)(6)(A).

3. **Plaintiff's *Confidentiality Agreement*[56] was intended to maintain in strict confidence Philips' proprietary information. Hence, defendant Bracero mistakes the reach and legal effects of such agreement.**

Lastly, defendant Bracero's attempt to dismiss the breach of contract claim stems from the Confidentiality Agreement he executed on January 31, 2011, with Philips. Bracero theorizes that the Confidentiality Agreement is null and void because the alleged consideration for the agreement is against Puerto Rico's laws and moral values. But in essence, Bracero is incorrectly relying on case law applicable to non-compete agreements. The case law and principles applicable to non-compete agreements in the employment context are completely distinguishable from the principles applicable to confidentiality agreements in the same context. Thus, Bracero has again failed to rebut the alleged insufficiency of plaintiff's allegations and his attempt to dismiss the breach of contract claim must be denied.

Pursuant to the criteria set forth by the applicable law and jurisprudence, the agreement signed by Bracero is valid and enforceable. Accordingly, the claims for breach of contract and damages cannot be dismissed.

The conclusion at which Bracero arrived in his motion, to wit, that the

---

[56] See **Docket Entry No. 38-3**, Amended Complaint.

consideration of the Confidentiality Agreement is against Puerto Rico laws, is meritless and devoid of grounds. Bracero asserts that since the Confidentiality Agreement was in exchange for keeping his employment and salary, the same was made in accordance with the employment-at-will doctrine. Such argument is, kindly, a stretch of imagination of the case law cited to support such an argument which is one of the Puerto Rico Supreme Court most recent opinions on the doctrine of employment-at-will, Rivera Figueroa v. The Fuller Brush Co., 180 D.P.R. 894 (2011).[57] The Puerto Rico Supreme Court considered the doctrine of constructive dismissal, and among its rulings, the Court made a brief expression regarding the employment-at-will doctrine in Puerto Rico. However, the Court in Fuller Brush, *supra*, did not entertain any issue related to confidentiality agreements. Consequently, the existence of a Confidentiality Agreement between the parties in the present case fails to convert the employment relationship between Philips PR and Bracero into one of "employment-at-will". Also, to conclude that the consideration of the agreement was "in exchange for keeping his employment with Philips, i.e., not being terminated without cause" is an unfounded and erroneous interpretation, therefore, this Honorable Court should disregard it.

To be clear, it is undisputed that on January 31, 2011 Bracero signed an *Employee Ethics Covenant and Reserved Rights* with Philips (the Confidentiality Agreement). In essence, the agreement required Bracero not to disclose any secret, confidential information, Philips' proprietary data, clients and providers in consideration for his employment at Philips and his salary, during the time of his employment. The parties also agreed that once Bracero's employment relationship with

---

[57] Plaintiff's response to defendant's argument is without waiving any contention that, as the moving party, Bracero had the obligation to provide this Honorable Court with a certified English translation of the Puerto Rico Supreme Court decisions in which he relied upon to support his motion to dismiss. See Puerto Ricans for Puerto Rico Party v. Dalmau, 544 F.3d 58, 67 (1st Cir. 2008). As a direct result, the Court should not consider the untranslated case law in which defendant relied upon to support his Rule 12(b) request.

Philips terminated, he had to return all written material and any other property of Philips, as well as any invention, technical innovation or business developed or conceived during his employment at Philips.

Article 1261 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. §3391 sets forth the requirements for a valid contract, which are: (i) consent of the contracting parties; (ii) a definite object which may be the subject of the contract; and (iii) the cause for the obligation which may be established. The Puerto Rico Civil Code also defines what the cause of a contract is. The sufficiency of consideration or cause, in contracts involving a valuable consideration is the "prestation" or promise of a thing or services by the other party is understood as a consideration for each contracting party; in remuneratory contracts, the service or benefits remunerated, and in those of pure beneficence, the mere liberality of the benefactor." See 31 P.R. Laws Ann. §3431.

Under Puerto Rico law, a bilateral obligation assumed by each one of the parties to the contract has, as its consideration, the promise offered in exchange. It is called mutual consideration. United States v. Perez, 528 F. Supp. 206 (1981).

In compliance with the requirements provided by the Puerto Rico Civil Code, 31 P.R. Laws Ann. §3141, *et seq.*, Philips entered into a valid and enforceable contract with Bracero to protect a reasonable and legitimate interest, which is its confidential information and trade secrets. It is an uncontested fact that Philips operates and does business in a fast-paced and technological innovative industry. In this type of industry, it is important to properly control business secrets, protect confidential information, and innovations which contribute to the company mission and provide competitive advantage as well. Accordingly, Philips enters into confidentiality agreements with its employees in order to protect its legitimate business activities.

A confidentiality agreement is a covenant through which the employee acknowledges that during the course of his employment, he or she will receive, develop or have access to secret, confidential, or proprietary information, which is the exclusive property of the employer. The employee agrees not to disclose such secrets to third parties and further provides that all trade secrets, proprietary, confidential information, including inventions and discoveries, that the employee develops as a result of his employment are property of the employer.  Stewart S. Manela & Arnold H. Pedowitz, Employee Duty of Loyalty a State-by-State Survey, 26 ABA Section of Labor and Employment Law (BNA Books 1995).

The underlying purpose of a confidentiality agreement is the employer's legitimate interest to protect highly valuable information that gives the employer a competitive edge over its competitors. The concept of legitimate interest includes the business goodwill, its clients, confidential information, and trade secrets, among others. See C. Zeno Santiago y V.M. Bermúdez Pérez, Tratado de Derecho del Trabajo, San Juan, Pubs. JTS, 2003, pág. 219 (*our translation*), see also, PACIV, Inc. v. Pérez Rivera, 159 D.P.R. 523, 2003 TSPR 84, P.R. Offic. Trans.  (Judgment, 2003); Arthur Young v. Vega III, 136 D.P.R. 157, 1994 P.R.–Eng. 909, 262 (1994). Also, confidentiality agreements serve other purposes. First, they give the employee notice of the type of information that the employer considers a trade secret. Second, these agreements are evidence of reasonable efforts to maintain secrecy. And, third, such agreements provide the employer with a breach of contract claim, inasmuch as they provide the grounds or legal basis for the employer to file a breach of contract claim if the employee fails to comply with his/her obligations under the agreement. See Kinney & Lange, P.A, Intellectual Property Law for Business Lawyers §12:9 (2015-2016 ed.).

In <u>Augat, Inc. v. Aegis, Inc.</u>, 565 N.E.2d 415, 418 (Mass. 1991) the Supreme Court of Massachusetts established several factors relevant for determining what constitutes confidential information: "the extent to which the information is known outside of the business"; "the extent of measures taken by the employer to guard the secrecy of the information"; and "the ease or difficulty with which the information could be properly acquired … by others." <u>Id</u>. citing <u>Jet Spray Cooler, Inc. v. Crampton</u>, *supra* 361 Mass. at 840, 282 N.E.2d 921.

Also, according to the Restatement (First) of Torts § 757 (1939), a trade secret is defined as follows:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business (see § 759) in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

Thus, in an effort to protect its trade secrets, Philips entered into the aforementioned Confidentiality Agreement with Bracero. It is vital to distinguish that the agreement at hand, which is part of an employee ethics covenant – akin to the expectations contained in a rule or policy – only requires the employee not to disclose proprietary business information belonging to Philips, and to return Philips' property

once the employment relationship concludes. Contrary to a non-compete agreement, the Confidentiality Agreement at issue here in no way prevents, interferes, or restricts the employee's right to work or earn a living. Since non-compete agreements restrict or limit a person's right to work or earn a living, in <u>Arthur Young v. Vega III</u>, *supra,* the Puerto Rico Supreme Court developed specific requirements that the employer has to comply with in order to enter into a valid and enforceable agreement. Such requirements are: (i) that the contract serves an employer's legitimate interest; (ii) the contract contains the specific time and place limitations; (iii) employee received an adequate consideration; (iv) that the employee signed freely and voluntarily; and, (v) that the contract is in writing. *Id.*, at 175-176. If the employer does not meet such requirements, the contract will be declared null and void.

As alleged in the Amended Complaint, in the present case Bracero not only misappropriated a copy of a software that was the <u>exclusive property</u> of his employer while employed with Philips; he too disclosed said confidential information to third parties; namely, to remaining co-defendants. Mr. Bracero had no rights to any of Philips' confidential information and/or trade secrets, therefore, he had no right to take unauthorized possession or disclose them to third parties, as he did.  Even without a confidentiality agreement that expressly forbade Bracero from doing what he did, the employee's duty of loyalty imposed on Bracero the responsibility to manage the software in question as a trade secret.

"In addition to the duties expressly undertaken by an employee in a written or oral employment contract, the common law imposes an implied duty of loyalty by the employee to the employer. In general, the employee is not permitted to undertake or participate in activities adverse to the interests of his employer during the course of

employment." <u>See</u> <u>Employee Duty of Loyalty a State-by-State Survey</u>, *supra* at 1. The duty of loyalty is based upon agency principles; an agent owes a duty to his principal. <u>Id</u>. The employment relationship is one of trust, confidence and loyalty. <u>Id</u>.; <u>Las Luminarias of the New Mexico Council of the Blind v. Isengard</u>, 92 N.M. 297, 587 P.2d 444 (N.M. App. 1978). One of an employee's fundamental obligations, arising from its duty to act with good faith, is the loyalty to his or her employer. This obligation consists in refraining from causing economic harm to the employer. <u>Arthur Young v. Vega III</u>, *supra* at 171. The employee's duty of loyalty is highly regarded in our jurisdiction; in an employment relationship, the lack of loyalty constitutes just cause for dismissal. <u>Mercedes Bus Line v. Tribl. de Distrito</u>, 70 D.P.R. 690, 695 (1949); <u>Srio. del Trabajo v. G.P. Industries</u>, 153 D.P.R. 223 (2001) (An employer has the right to assess its employees, based on moral values and public policy principles). This duty of loyalty incudes the nondisclosure of confidential information and trade secrets to third parties, even without an express agreement, 91 Am. Jur. Proof of Facts 3d 95, <u>Establishing Liability for Misappropriation of Trade Secrets</u> §29 (2006).

> An employee has a duty not to reveal or use confidential information developed by his or her employer if the information is a trade secret which gives the employer a competitive advantage, if it was disclosed to the employee in confidence and if it would be unjust under the circumstances to permit the employee to disclose or use the information. **This is so even if there is no written agreement between the employer and employee**. When an employee's employment has terminated the employee may not take confidential information developed by his employer but may take general skills and knowledge acquired during his tenure with the former employer. Any actions of the employee will be imputed to a new employer. (Emphasis ours).

Even without an explicit confidentiality agreement, the duty of loyalty requires the employee not to cause any harm to his or her employer, that is, to not disclose confidential information of the company. <u>New England Overall v. Woltman</u>, 176 N.E.2d

193 (1961); C. Zeno Santiago y V.M. Bermúdez Pérez, <u>Tratado de Derecho del Trabajo</u>, at 223.

Bracero has not questioned the validity of the Confidentiality Agreement he freely and voluntarily executed. The Confidentiality Agreement in question is valid and its terms enforceable. In this jurisdiction, non-disclosure clauses have been distinguished from non-compete and non-solicitation covenants. It has been interpreted that non-disclosure clauses can subsist, even when a non-compete contract was declared null and void because it failed to meet the restrictive requirements of consideration and reasonableness. In <u>Cherena v. Coors Brewing Company</u>, 20 F.Supp.2d 282 (D.P.R. 1998), this Honorable Court expressed the following:

> "Consequently, this court is now amending its opinion and order in order to clarify that it is only declaring null and void the clause containing the non-competition covenant. As CBC has pointed out, the Agreement contains a severability clause which permits the confidentiality provisions of the contract to remain in effect even though the clause containing the covenant not-to-compete has been held invalid. Thus, **although the non-competition clause is null and void, the rest of the provisions contained in the Agreement, including the non-disclosure provisions, are valid and enforceable**." (Emphasis ours).

It follows from the foregoing that non-disclosure clauses can survive the "consideration and reasonable requirements" applicable to non-compete agreements, because if not, those clauses would have been declared null and void as well. In <u>Jimenez v. Island Oasis Frozen Cocktail Co., Inc.</u>, 2010 WL 3719216 (D.P.R. 2010), this Honorable Court also considered a similar argument:

> "C. Validity of the Non–Competition Clause
> Defendant states in its reply brief (see Docket No. 94 at 8) that it has conceded that the noncompetition clause in the Employment Agreement (Docket No. 1–2) is unenforceable. Therefore, the court DECLARES that the non-competition clause is UNENFORCEABLE. However, this declaration does not dispose of the question of the enforceability of the non-disclosure clause. In its motion for summary judgment, Defendant

contends that the non-disclosure clause of the agreement is still valid. (See Docket No. 78 at 14–15.) In support of this contention Defendant cites *Cherena v. Coors Brewing Co.*, 20 F.Supp.2d 282 (D.P.R.1998). In *Cherena*, this court held that, because an agreement containing a non-competition clause did not meet the criteria as delineated in *Arthur Young & Co. v. Vega III*, 136 D.P.R. 157 (1994) said clause was not enforceable between the parties. 20 F.Supp.2d at 286. **However, the *Cherena* court preserved the non-disclosure clause of the agreement, holding that, even though the non-compete failed to satisfy the requirements of consideration and reasonableness, the non-disclosure clause was preserved because of the application of a severability clause**. *Cherena*, 20 F.Supp.2d at 288–89. Mirroring the facts of *Cherena*, the agreement in this case also contains a severability clause. (See Docket No. 1–2 at ¶ 6.) The inclusion of this clause preserves the validity of the non-disclosure clause at issue. See *Cherena*, 20 F.Supp.2d at 288–89. Therefore, the court GRANTS summary judgment in favor of Defendant and DECLARES that the non-disclosure clause is ENFORCEABLE against Plaintiff." (Emphasis ours).

To summarize, confidentiality agreements protect a legitimate interest of the employer and do not limit or restrict the right of an employee to earn a living. The Confidentiality Agreement in this case ratifies that the duty of loyalty that Bracero had with Philips PR not only required him not to disclose trade secrets to third parties as he did, but to return the MR Response Generator Tool he kept without authorization. Therefore, the Confidentiality Agreement at issue is fully binding and enforceable.

### C. Final considerations concerning Philips PR's request for preliminary injunctive relief.

For the sake of brevity, plaintiff hereby incorporates by reference each of the arguments in support of its renewed request for preliminary injunction, as set forth at **Docket Entry No. 41**, in response to Bracero's opposition to the same.[58] However, to avoid the potential waiver of any arguments, plaintiff hereby addresses Bracero's newly raised contention involving Philips PR's supposed violation of the CFAA.

---

[58] *Plaintiff's Motion in Response to Defendants' Docket Entries No. 28 and No. 32 and Supplementing Request for Preliminary Injunction.*

### 1. Philips PR's alleged violation of the CFAA.

Specifically, defendant Bracero now argues that plaintiff's use of its Remote Services Network Router ("RSNR") has somehow caused it to breach the provisions of the CFAA. <u>See</u> **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pg. 42-43. This, according to defendant, "allows" it to assert the "unclean hands" defense against Philips PR, which in turn, "precludes" plaintiff from obtaining recovery or relief under the CFAA. Yet, the Court should conclude that plaintiff's alleged "conduct" concerning the MRIs does not warrant the application of the "unclean hands" defense.

Clearly, the availability of this affirmative defense falls short when applied to the facts of this case, as alleged. <u>See</u> e.g. <u>Dr. José S. Belaval, Inc. v. Pérez-Perdomo</u>, 488 F.3d 11, 15 (1st Cir. 2007). Besides, other than having no standing to set forth this assertion, plaintiff finds defendant's continued double standard in construing the CFAA amusing. Inexplicably, while plaintiff's allegations are said to be insufficient to surpass the *Twombly/Iqbal* plausibility threshold, defendant's own incantations of the elements of Section 1030(a)(2)(C) are surprisingly satisfactory. It can be plainly observed, though, how this "illegality" by Philips PR does not even suggest having caused any impermissible "damage" or "loss" to Medical X Ray or Dr. Rivera.

Among other things, and without waiving any of its arguments concerning the proper standard for dismissal,[59] defendant's innuendo that plaintiff's RSNR somehow violates the Health Insurance Portability and Accountability Act's ("HIPAA") Privacy Rule, 45 C.F.R. Part 160, is simply unsustainable. Suffice it to say that all remote access tools in Philips' equipment are required to be in accordance with HIPAA regulations. As such, the RSNR does not give plaintiff access to protected health information (PHI).

---

[59] <u>See</u> *supra* Section II.A.

Borrowing from defendant's philosophy, Bracero's reliance on Dr. Rivera's statement to support this contention is nothing more than the throwing of stones at a glass ceiling. See **Docket Entry No. 54**, Bracero's Second Dismissal Request, at pg. 42. By itself, this argument should serve to discredit and unmask the rhetoric of all of Bracero's previous arguments. Accordingly, the Court should find that plaintiff's conduct does not warrant the application of the "unclean hands" defense. Plainly, Bracero's reasoning and facts fall short from the defense.

Ultimately, defendants' requests for dismissal truly form part of their attempts to delay any efforts from plaintiff at obtaining preliminary injunctive relief. The Amended Complaint in this case, viewed in the light most favorable to plaintiff, states a valid cause of action under the CFAA, 18 U.S.C. §1030.

**FOR ALL THE FOREGOING REASONS**, defendants' individual motions to dismiss should be **DENIED** outright and the Court should issue forthwith and without further delay the preliminary injunction requested by Philips PR.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 25th day of February, 2016.

**WE HEREBY CERTIFY** that on this same date the foregoing motion was filed with the Clerk of Court using the CM/ECF system, which will provide notice to all counsel of record.

**ADSUAR MUÑIZ GOYCO
SEDA & PÉREZ-OCHOA, P.S.C.**
P.O. Box 70294
San Juan, P.R. 00936-8294
Tel: 787.756.9000
Fax: 787.756.9010
Email: epo@amgprlaw.com
amercado@amgprlaw.com

By: _s/Eric Pérez-Ochoa_
Eric Pérez-Ochoa
USDC-PR No. 206314

By: _s/Alejandro H. Mercado_
Alejandro H. Mercado
USDC-PR No. 224708

*Counsel for Philips Medical
Systems Puerto Rico, Inc.*